J-A20009-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| DARNELL JENKINS, | : | |
| | : | |
| Appellant | : | No. 2658 EDA 2013 |

Appeal from the Judgment of Sentence September 3, 2013,
Court of Common Pleas, Philadelphia County,
Criminal Division at No. CP-51-CR-0005600-2011

BEFORE:  DONOHUE, SHOGAN and WECHT, JJ.

MEMORANDUM BY DONOHUE, J.:                **FILED OCTOBER 20, 2015**

Appellant, Darnell Jenkins ("Jenkins"), appeals from the judgment of
sentenced entered on September 3, 2013 by the Court of Common Pleas of
Philadelphia County, Criminal Division, following his convictions of first-
degree murder, firearms not to be carried without a license, carrying
firearms on public streets or public property in Philadelphia, and possessing
instruments of crime ("PIC").[1]  For the reasons that follow, we vacate
Robinson's judgment of sentence and remand for a new trial.

The trial court summarized the facts of this case as follows:

> On September 8, 2010, at about 10:25 p.m.,
> [Jenkins allegedly] shot Lamont Smith ("Smith") in
> the head as a result of an on-going dispute between
> them.  At trial, the jury heard that Jared Stovall
> ("Stovall"), on the day before the shooting, made a
> plan to get defendant Jenkins and the victim Smith

---

[1]  18 Pa.C.S.A. §§ 2502(a), 6106(a)(1), 6108, 907(a).

together because Stovall wanted Jenkins and Smith to "squash the beef" between them. Multiple phone calls between Stovall and decedent Smith and between Stovall and Jenkins confirm that Stovall set up the meeting between Jenkins and Smith.

Jenkins was seemingly apprehensive about the meeting because earlier in the day [on] September 8th someone had shot at him. Accordingly, Jenkins decided that he needed additional weapons to bring to the arranged meeting and he asked neighborhood friend Martamus Watts ("Watts") to get him a "second" gun. Numerous text messages sent between Jenkins and another number ending in 3705 both before and after the shooting on September 8, 2010 confirm that Jenkins brought a gun with him to the meeting. Specifically, at 10:16 p.m.[,] Jenkins texted "He on his way with dudes frm [sic] Willows. I got bull Jerry hammer on me." Then there was a response text saying "You want me to bring minds [sic] out or what!" At 10:19 p.m., approximately six minutes before the murder, Jenkins responded saying "Yea, he bring niggas frm [sic] 58 and Willows."

The arranged meeting turned into an argument between Jenkins and Smith and gunfire erupted. Witnesses heard about four or five gunshots and saw muzzle flash from Jenkins' hand. Immediately after hearing the gunshots, the witnesses saw Smith fall to the ground. Jenkins and Stovall both took off running westbound on Chester Street from 60th to 61st. Stovall later texted one of the witnesses to see if Smith was dead and if there were "any shells outside."

Philadelphia police officers arrived on scene and found Smith lying on his right side with a large pool of blood under his head. The officers recovered two cell phones from Smith's pocket as well as his keys and glasses. Additionally, the officers recovered Smith's five-shot black revolver with five live cartridges that had been underneath his waist area.

Medics arrived and transported Smith to the Hospital of the University of Pennsylvania, where he was pronounced dead on September 9, 2010 at 1:58 a.m. An autopsy revealed that victim Smith had sustained three .38/.357 caliber gunshots to the head, specifically two to the neck and one to the brain.

Trial Court Opinion, 6/27/14, at 3-4 (footnotes omitted).

On September 3, 2013, following trial, a jury found Jenkins guilty of the above-referenced crimes. At the conclusion of trial, the trial court sentenced Jenkins to life imprisonment without the possibility of parole. On September 11, 2013, Jenkins filed a timely notice of appeal. On April 25, 2014, the trial court ordered Jenkins to file a concise statement of the errors complained of on appeal pursuant to Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure. On May 16, 2014, Jenkins filed his timely Rule 1925(b) statement.

On appeal, Jenkins raises the following issues for our review and determination:

1. Did not the trial court err in permitting Roland Jackson to testify to incidents of intimidation, where there was no evidence that those incidents occurred at [Jenkins'] behest, where the witness was fully cooperative with the prosecution both at the time of his initial statement and at trial, and where such evidence was therefore both irrelevant and grossly prejudicial?

2. Did not the attorney for the Commonwealth commit gross and intentional misconduct by violating the [trial] court's order limiting the introduction of prior statements and testimony of Roland Jackson,

- 3 -

repeatedly inquiring as to matters specifically barred by the court, and commenting in the jury's presence that he was not being "allowed" to introduce certain material, and did not the court err in denying the defense's motion for a mistrial on the basis of that misconduct?

Jenkins' Brief at 3.

For his first issue on appeal, Jenkins argues that the trial court erred in permitting the Commonwealth to question Roland Jackson ("Jackson"), the Commonwealth's principal eyewitness, about how he was threatened and told not to come to court prior to testifying at the preliminary hearing in this case. Jenkins' Brief at 12-18. Jenkins asserts that because there is no evidence linking him to these threats and because the Commonwealth did not use this testimony to explain inconsistencies in Jackson's testimony or to explain any prior inconsistent statements made by Jackson, the evidence was irrelevant and grossly prejudicial. *Id.* at 12, 15-16.

Jenkins' first issue challenges an evidentiary ruling made by the trial court. We review a trial court's evidentiary decisions according to the following standard:

> The decision to admit or exclude evidence is committed to the trial court's sound discretion, and evidentiary rulings will only be reversed upon a showing that a court abused that discretion. A finding of abuse of discretion may not be made merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. Matters within the trial

court's discretion are reviewed on appeal under a deferential standard, and any such rulings or determinations will not be disturbed short of a finding that the trial court "committed a clear abuse of discretion or an error of law controlling the outcome of the case."

***Commonwealth v. Koch***, 106 A.3d 705, 710-11 (Pa. 2014) (quotations and citations omitted).

The questioning to which Jenkins takes issue proceeded as follows:

Q     There were a couple of incidents that occurred after [the interview with detectives], both on a bus and at your house, that caused you not to come to the [c]ourt when you were subpoenaed for a preliminary hearing in the months that followed September of 2010?

A     Yes.

Q     I'm not asking and you're not to say who it was who came or anything like that, but were you instructed not to come to court?

A     Yes.

Q     That was the first time getting off the bus?

A     Yes.

Q     And then somebody came or two people came to your home?

A     Yes.

Q     How did that make you feel?

A     I was mad.

Q     Also scared?

> A    A little bit.
>
> Q    If not for you but for your three-year-old son?
>
> A    I ain't really scared; I'ma [sic] be honest. I ain't scared of nobody.

N.T., 8/27/13, at 56-57.

Regarding the threatening of witnesses, this Court has held:

> In general, "'threats by third persons against ... witnesses are not relevant [and thus not admissible into evidence] unless ... the defendant is linked in some way to the making of the threats.'" **Commonwealth v. Carr**, [] 259 A.2d 165, 167 ([Pa.] 1969) (citation omitted). Nevertheless, an exception to the rule exists where the evidence in question was not offered to prove the accused's guilt "but to explain a [witness'] prior inconsistent statement." [**Id.**] at 167.

**Commonwealth v. Bryant**, 462 A.2d 785, 788 (Pa. Super. 1983) (brackets, except for citation modifications, in original); **see also Commonwealth v. Collins**, 702 A.2d 540, 544 (Pa. 1997) ("[T]he Commonwealth's line of questioning was permissible to demonstrate [that the witness'] motive for changing his testimony was that he was afraid of the consequences if he testified truthfully."); **Commonwealth v. Martin**, 515 A.2d 18, 21 (Pa. Super. 1986) ("When the evidence in question is not offered to prove the defendant's guilt, but to explain a [witness'] prior inconsistent statement, however, it is admissible."). "Such evidence, however, must be used to rehabilitate the witness *after* the defense, in an effort to discredit the witness, has questioned the witness about the previous

testimony." ***Commonwealth v. Rickabaugh***, 706 A.2d 826, 838 (Pa. Super. 1997) (emphasis in original).

We conclude that the trial court erred in allowing the Commonwealth to question Jackson about the threats he received prior to testifying at the preliminary hearing. First, as the Commonwealth concedes and the certified record on appeal confirms, there is no evidence linking Jenkins to making threats against Jackson. ***See*** N.T., 8/26/13, at 11. Although the record does reflect that Jenkins' brother Jermaine was responsible for threatening Jackson, there is no evidence Jenkins wanted his brother or encouraged his brother to do so. ***See id.*** at 4-21; N.T., 8/30/13, at 85; ***see also*** Jenkins' Motion In Limine, 8/19/13, ¶ 1(d.). Additionally, while arguing the matter prior to trial, the prosecutor stated that he was not going to make any connection between Jenkins and the threats and that he was not going bring out that it was Jenkins' brother who threatened Jackson. N.T., 8/26/13, at 11. Furthermore, the trial court instructed the jury that they could not "infer that [Jenkins] in any way directed, requested or even was aware that the contact was made or even knew the people who made the contact." N.T., 8/30/13, at 85. Thus, the jury heard no evidence linking Jenkins to threats made against Jackson.

Second, the certified record also reflects that the Commonwealth did not offer the evidence of the threats against Jenkins to explain a prior inconsistent statement. The Commonwealth questioned Jackson about the

threats he received on direct examination, not redirect examination. ***See*** N.T., 8/27/13, at 56-57. While Jenkins did attempt to impeach Jackson at trial with portions of his testimony from the preliminary hearing, ***see id.*** at 93-94, 106-10, the Commonwealth never offered the threats against Jackson as an explanation for these inconsistencies. Thus, the Commonwealth did not use the evidence of the threats against Jackson following an effort by Jenkins' counsel to discredit Jackson by questioning him about previous testimony. ***See Rickabaugh***, 706 A.2d at 838.

The Commonwealth argues that the evidence of threats against Jackson was admissible "to show their impact on the witness," "to allow the jury to fairly evaluate Jackson's demeanor," and to assist in the jury's determination of Jackson's state of mind. Commonwealth's Brief at 14, 20. The Commonwealth asserts that Jackson appeared agitated while on the stand, which it contends the jury could have attributed "to a lack of candor or malice towards [Jenkins]." ***Id.*** at 14-15. As stated above, evidence that a witness was threatened by someone other than the defendant is generally inadmissible at trial. ***See Bryant***, 462 A.2d at 788. The narrowly prescribed exception to the general rule is that such evidence is admissible only to explain a prior inconsistent statement. ***See id.*** The exception to the rule proposed by the Commonwealth here, namely that the evidence is admissible so that the jury can assess the witness' state of mind, is so broad that it would, in practice, swallow the general rule. In the present case, the

Commonwealth contends that the threats to Jackson show that he testified credibly despite fear of retribution. Commonwealth's Brief at 16. Such an argument, however, could be (and presumably would be) made for any witness testifying that he or she had received some threat prior to taking the stand. This result would be contrary to the well-established law of Pennsylvania in this area.

Additionally, the Commonwealth argues that the evidence of threats against Jackson is admissible to explain why he did not voluntarily come forward with information about Smith's murder and to explain why he was not initially forthcoming with police. *Id.* at 15. Jackson, however, testified that he did not receive any threats until after his initial police interview and prior to when he was to testify at the preliminary hearing.[2] N.T., 8/27/13, at 56. Thus, the threats Jackson received after his initial police interview are not relevant to explain why he did not voluntarily come forward with information about the murder or why he was not initially forthcoming with police.[3]

---

[2] We note that it was the Commonwealth, and not Jenkins' counsel, who elicited the testimony about Jackson not being initially forthcoming when he spoke to police. *See* N.T., 8/27/13, at 55-56.

[3] Furthermore, the Commonwealth contends that the evidence of threats against Jackson is admissible because the basis of Jenkins' defense, as indicated by Jenkins' counsel's opening statement, was that Jackson was not a credible witness who was falsely accusing Jenkins of murder and that it was therefore proper to preemptively address Jackson's credibility on direct examination by bringing out the evidence of threats against Jackson. *See*

The testimony regarding the threatening of Jackson did not implicate Jenkins nor was it elicited in response to Jenkins' counsel impeaching Jackson's testimony. Thus, the trial court clearly erred in admitting the evidence of threats against Jackson. *See Bryant*, 462 A.2d at 788. This does not end our inquiry, as we must now determine whether this error was harmless. *See Rickabaugh*, 706 A.2d at 838 ("we must now consider whether the error warrants a reversal of Appellant's conviction; for it is well-settled that not every legal mishap prejudices a defendant to the extent that a reversal is necessary"). Our Supreme Court has stated the following regarding the harmless error doctrine:

> "The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. Rasheed*, [] 640 A.2d 896, 898 ([Pa.] 1994); *Commonwealth v. Story*, [] 383 A.2d 155 ([Pa.] 1978). We have described the proper analysis as follows:
>
>> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was de minimis; or (2) the erroneously admitted evidence was merely cumulative of other untainted

---

Commonwealth's Brief at 15-16 n.4. The Commonwealth, however, does not cite any pertinent authority in support of this argument. *See id.* Rather the Commonwealth cites two inapplicable cases holding that where a defendant bases his or her defense on impeaching a witness' credibility, the Commonwealth may introduce prior consistent statements before the defense impeaches the witness on cross-examination. *See id.* (citing *Commonwealth v. Cook*, 952 A.2d 594, 625-26 (Pa. 2008); *Commonwealth v. Smith*, 540 A.2d 246, 258 (Pa. 1988)).

evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

**Commonwealth v. Hairston**, 84 A.3d 657, 671-72 (Pa. 2014) (quoting

**Commonwealth v. Hawkins**, 701 A.2d 492, 507 (Pa. 1997);

**Commonwealth v. Williams**, 573 A.2d 536 (Pa. 1990)).

We conclude that the harmless error doctrine is inapplicable here because none of the three above-referenced requirements prongs of the were satisfied in this case. First, the trial court's error was not de minimis and did prejudice Jenkins because it predisposed the jury to believe Jackson's testimony. As the Commonwealth readily acknowledged,

That [Jackson] chose to testify, in the face of threats, was also relevant because it spoke volumes about his credibility. It was reasonable for the jury to conclude that the witness would only have faced down those threats if he had actually seen [Jenkins] murder [Smith], and not merely to falsely accuse someone.

Commonwealth's Brief at 16.

It is well settled, however, that "the question of a witness['] credibility is reserved exclusively for the jury." **Commonwealth v. Alicia**, 92 A.3d 753, 761 (Pa. 2014) (quoting **Commonwealth v. Davis**, 541 A.2d 315, 317 (Pa. 1988)); **see also Commonwealth v. Kane**, 10 A.3d 327, 334

(Pa. Super. 2010) (holding that the "credibility of witnesses is a matter within the exclusive province of the factfinder").  Additionally, "Evidence of a witness['] character for truthfulness or honesty is not admissible to bolster the witness['] credibility unless the witness['] truthfulness and honesty have first been attacked."  *Commonwealth v. Schwenk*, 777 A.2d 1149, 1156 (Pa. Super. 2001)

By allowing the Commonwealth to introduce evidence of the intimidation of Jackson to demonstrate that he was a credible witness, without Jackson's credibility having first been attacked, the trial court permitted the Commonwealth to invade the province of the jury's exclusive right to make credibility determinations.  *See Commonwealth v. Smith*, 567 A.2d 1080, 1083 (Pa. Super. 1989) (holding that by introducing evidence of a witness' credibility prior to the defense impeaching that witness, the Commonwealth "usurped the credibility determining function of the jury").  The improperly admitted evidence of the intimidation of Jackson allowed the Commonwealth to show that Jackson, the lone eyewitness to the murder in this case and the only source of evidence that could put Jenkins at the scene of the crime, testified in the face of threats and potential retribution.  This predisposed the jury to believe and find credible the testimony of the Commonwealth's most important witness.  Consequently, the trial court's error in this respect was not de minimis and was prejudicial to Jenkins.

Second, the erroneously admitted evidence was not merely cumulative of other untainted evidence that was substantially similar to the erroneously admitted evidence. Jackson was the lone eyewitness of the murder in this case. He provided the only testimony that placed Jenkins at the scene of the crime and was the only witness that identified Jenkins as the person that shot Smith.

Third, we cannot conclude that the trial court's error could not have contributed to the verdict as the properly admitted and uncontradicted evidence of guilt was not overwhelming and the prejudicial effect of the error was not insignificant by comparison. A review of all of the evidence of guilt introduced in this case, excluding the testimony of Jackson, reveals the following.

Martamus Watts ("Watts"), who had known Jenkins for a couple months prior to Smith's murder, testified that he met with Jenkins on September 8, 2010, approximately a half hour before Smith was killed. N.T., 8/26/13/, at 157-58. Watts stated that Jenkins spoke briefly with him about an earlier altercation Jenkins had in which someone had shot at him. *Id.* Watts recounted that Jenkins asked Watts if he could get him a second gun because he was going to meet a couple of men near 60th Street and Chester Street to "squash the beef" between them and that he would feel safer if he had another weapon. *Id.* at 159-62.

Rasheed Dublin ("Dublin") testified that when was coming home from work on September 8, 2010, between 10:20 and 10:30 p.m., he observed three black males on the 6000 block of Chester Street, none of whom he recognized, talking with one another. N.T., 8/29/13, at 50-52. Once Dublin was inside his house, he heard multiple gunshots. *Id.* at 51-52. Dublin immediately ran outside and upon observing Smith lying on the ground in a pool of blood, dialed 911. *Id.* at 51-53. Dublin was unable to identify either Jenkins or Stovall as one of the three men he saw conversing on the 600 block of Chester Street. *Id.* at 52. After he reviewed a picture of Stovall, whom he recognized from the neighborhood, Dublin further testified that he could definitely say that Stovall was not one of the three men he observed that evening. N.T., 8/29/13, at 58; *see also* N.T., 8/30/13, at 17.

Officer Charles Henry ("Officer Henry"), of the Philadelphia Police Department, testified that he and Sergeant Michael Davis ("Sergeant Davis") responded to a radio call, at approximately 10:25 p.m. on September 8, 2010 for shots fired near 60th Street and Chester Street. N.T., 8/27/13, at 146-47. Officer Henry stated that the flash information described two black males in their mid-twenties, both approximately 5'7", fleeing westbound on Chester Street from 60th to 61st wearing white t-shirts, and blue jeans, one of whom had a close haircut, a beard, and glasses. *Id.* at 147. Officer Henry testified that when he and Sergeant Davis arrived at the crime scene, they encountered Smith lying on the ground in a pool of blood around his

head.  *Id.* at 147-48.  Officer Henry recounted that at the crime scene, he and Sergeant Davis recovered two cell phones from Smith's pocket and a black revolver near Smith's body.  *Id.* at 148.  Officer Brian Stark, who processed the crime scene, testified that the revolver recovered near Smith was a five-shot revolver loaded with five live (unfired) cartridges.  N.T., 8/26/13, at 104-05, 115.  Officer Henry further testified that he and Sergeant Davis also encountered Roland Jackson near the crime scene, who was sitting on the steps of 6029 Chester Street.  N.T., 8/27/13, at 157.  The two officers also later spoke with Stovall's mother, who had last seen Stovall around 7:50 p.m. that evening, and informed them that he was wearing a white t-shirt, blue jean shorts, and glasses.  *Id.* at 154.  Sergeant Davis also testified and his testimony corroborated that of Officer Henry.  *See* N.T., 8/29/13, at 73.

Dr. Marlon Osbourne ("Dr. Osbourne"), from the medical examiner's office, testified that Smith died from multiple gunshots to the head and neck.  N.T., 8/27/13, at 11.  Officer Cruz, who examined the ballistics, testified that all three of the bullets removed from Smith's head and were fired from the same firearm, which was either a .38 caliber revolver or a .357 caliber revolver.  N.T., 8/26/13, at 142-44.  Watts stated that he had once or twice, prior to Smith's murder, seen Jenkins in possession of a black, slightly rusty, .38 caliber revolver.  *Id.* at 169.

Additionally, the jury heard testimony from Detective John Verecchio ("Detective Verecchio") of the Philadelphia Police Department and Agent William Shute ("Agent Shute") of the FBI Cellular Analysis Survey Team, regarding cell phone activity on the night of the murder. Detective Verecchio testified that between 9:40 p.m. and 10:20 p.m. there were six calls from Stovall to Smith and that Stovall also made calls to Jenkins in that timeframe. N.T., 8/28/13, at 186-87. Agent Shute testified that between 10:05 p.m. and 10:43 p.m. there were nine calls on Jenkins' phone that originated in geographical area that included the location of Smith's murder. *Id.* at 90-98. Based on Jenkins' cell phone data, Agent Shute was able to conclude that between 10:05 p.m. and 10:43 p.m. on the night of Smith's murder, Jenkins was present in a geographic area that included the crime scene. *Id.* at 94-98.

Further, as stipulated by counsel, the jury heard evidence regarding several text messages sent between Jenkins and other numbers of unknown persons both before and after Smith's murder. On September 8, 2010, the night of Smith's murder, at 10:16 p.m., Jenkins texted a number ending in 3705 the following: "He on his way with dudes frm Willows. I got bull Jerry hammer on me." N.T., 8/29/13, at 31. Detective Verecchio testified that he understood "hammer" to mean "gun." N.T., 8/28/13, at 221. Then there was a response text from the 3705 number that read: "You want me to bring minds out or what!" N.T., 8/29/13, at 31. At 10:19 p.m.,

approximately six minutes before Smith's murder, Jenkins responded to the 3705 number: "Yea, he bring niggas frm 58 and Willows." *Id.* at 31. The same night, following the shooting, at approximately 10:39 p.m., a text was sent to Jenkins from the 3705 number stating: "Switch this line for safety." *Id.* at 31-32. Then, at 11:57 p.m., there was another text to Jenkins from the 3705 number saying "They no – boy crib. Don't talk to him no more or say anything to at all." *Id.* at 32.

Additionally, there was an exchange of text messages between Jenkins and another number ending in 3496 on September 13, 2010. Jenkins received a text that read: "Shit cooled dwn since that day. It dnt be no undies and a whole lot of cop cars sliddn up da'9 or da'0 when I be out there. So just lay low for like anova week. R." *Id.* at 33. In response, Jenkins sent a text to the 3496 number stating: "Helan dis Jalil cousin. Get with me. Dee. A 10 on the scale." *Id.* Finally, there was a text from Jenkins to another number ending in 4849 on September 14, 2010 saying "My other number to reach me at (267) 250-2979. Dee." *Id.* at 34.

Thus, based on this evidence, the certified record reflects that, in the hour before Smith's murder, there were several telephone conversations between Smith and Stovall and Stovall and Jenkins, though the content of these phone conversations is unknown. During that same timeframe on the night of the shooting, Jenkins met with and told Watts that he was nervous about meeting with some other men near 60th and Chester Street in order to

"squash the beef" and that he was heading to this meeting with at least one gun and that he would have felt safer if he had a second gun. Jenkins attempted to obtain a second firearm from Watts for this meeting. Shortly before Smith's death, Jenkins also texted an unknown person that he was going to a meeting with unidentified individuals, that he was bringing a gun to the meeting, and he told the recipient of the text to bring a gun with him or her to this meeting. The record does not reveal with whom Jenkins was meeting with or that Jenkins actually attended the meeting. Except for Jackson's testimony, we do not know Jenkins' exact location at the time Smith was shot or if he was ever at the scene of the crime. The record, however, does reflect that Jenkins was in a geographic area during Smith's murder that included the crime scene.

The certified record further reflects that Smith died of multiple gunshots wounds from either a .38 caliber revolver or a .357 caliber revolver, but we do not know which gun was used. We do know, however, that Watts had seen Jenkins in possession of a .38 caliber revolver prior to Smith's murder. Finally, the certified record reflects, according to the text messages stipulated to by the Commonwealth and Jenkins, that Jenkins was instructed to "lay low" for a time after Smith's death.

Accordingly, based on this evidence, we cannot say, excluding Jackson's testimony, that there was overwhelming evidence of guilt. At most, the evidence, excluding Jackson's testimony, reveals that at the time

of Smith's murder Jenkins was armed, on his way to meet with unknown individuals to "squash the beef," somewhere in the vicinity of the scene of the crime. The evidence, excluding Jackson's testimony, also reflects that Jenkins, at some point prior to Smith's murder, was in possession of the same type of gun with which Smith **may** have been shot. The evidence, excluding Jackson's testimony is circumstantial at best, as none of it places Jenkins at the scene of the crime when Smith was shot or identifies Jenkins as the shooter. Therefore, we conclude that improper admission of evidence relating to the intimidation of Jackson was not harmless.[4]

Although we resolve Jenkins' first issue in his favor, we nonetheless proceed to address his second issue, for purposes of completeness, because we will be remanding this case for a new trial. For his second issue on appeal, Jenkins argues the trial court erred in denying his request for a mistrial based on prosecutorial misconduct. Jenkins' Brief at 19-28. Our standard of review for claims of prosecutorial misconduct is as follows:

> Our standard of review for a claim of prosecutorial misconduct is limited to whether the trial court abused its discretion. In considering this claim, our attention is focused on whether the defendant was deprived of a fair trial, not a perfect one. Not every inappropriate remark by a prosecutor constitutes reversible error. A prosecutor's statements to a jury do not occur in a vacuum, and we must view them in context. Even if the prosecutor's arguments are improper, they generally will not form the basis for a

---

[4] We note that the Commonwealth did not attempt to make any harmless error argument.

> new trial unless the comments unavoidably prejudiced the jury and prevented a true verdict.

*Commonwealth v. Toritto*, 67 A.3d 29, 37 (Pa. Super. 2013) (en banc), *appeal denied*, 80 A.3d 777 (Pa. 2013) (quoting *Commonwealth v. Lewis*, 39 A.3d 341, 352 (Pa. Super. 2012)). Therefore, "we focus not on the culpability of the prosecutor but rather on whether his actions deprived [the appellant] of a fair trial by prejudicially rendering the jury incapable of fairly weighing the evidence and entering an objective verdict." *Commonwealth v. Melvin*, 103 A.3d 1, 27 (Pa. Super. 2014).

The prosecutorial misconduct with which the Commonwealth takes issue followed extensive argument over the question of whether the Commonwealth could, in response to the impeachment of Jackson and another witness, Martamus Watts, call a fellow Assistant District Attorney to read the entirety of those witnesses' police statements and preliminary hearing testimony into the record. *See* N.T., 8/27/13, at 175-222; N.T., 8/28/13, at 4-66. The trial court ruled, much to the prosecutor's dismay, that the Commonwealth could rehabilitate the witnesses only as to those points on which they had been impeached, but that it would not permit the Commonwealth to bolster the witnesses' testimony by pointing to their consistency on every other point to which they had previously spoken or testified. *See id.*

The questioning leading to the request for a mistrial proceeded as follows:

> Q     In any way, shape or form was [Jackson] ever uncooperative?
>
> [Defense Counsel]:  Objection, Your Honor.
>
> THE COURT:  Sustained.  Ms. Pescatore is not a witness.  She's here just to read for you what was said or done at the preliminary hearing notes.  Her credibility, who she is is not for you to assess.  She's just here to read something to you.  In fact, I don't believe -- is my understanding.  That's the objection?
>
> [Defense Counsel]:  Yes, Your Honor.
>
> THE COURT:  So even though -- so we're just here so she can give to you that information in the notes that I think she has.  So objection sustained.
>
> [Prosecutor]:  Okay.
>
> BY [Prosecutor]:
>
> Q     So let's go to where I'm allowed to read from.
>
> [Defense Counsel]:  Objection.
>
> THE COURT:  Sustained.
>
> BY [Prosecutor]:
>
> *       *       *
>
> Q     Okay.     And did [Jackson], during that preliminary hearing, identify anyone other than [Jenkins] as the shooter in this case?
>
> [Defense Counsel]:  Objection.

- 21 -

THE COURT: Sustained. What I'm going to tell my jury: What did or didn't happen at the preliminary hearing is not what you're evaluating. It's just whether something that you hear here is consistent or not, and how does that affect your view of the believability of [Jackson]'s testimony in court to you.

You may continue

BY [Prosecutor]:

\* \* \*

Q    Was there anywhere in these notes of testimony that [Jackson] named [Stovall] as the shooter?

[Defense Counsel]: Objection.

THE COURT: Sustained. Again, [Prosecutor], you know what she is here for. This is not for you guys to say, here's what may or may not have happened in the preliminary hearing. We're only hearing this to see if it was consistent or not with what you heard in court, and how does that affect witness'[] believability and credibility.

[Prosecutor], I don't want to have to interrupt you again. You know what my ruling was.

BY [Prosecutor]:

Q    Turn to Page 25, please, Ms. Pescatore. Starting with Line 3, you are permitted to go to Line 15.

[Defense Counsel]: Objection.

THE COURT: Sustained.

[Prosecutor]: Okay. Not 15? I don't know.

THE COURT: The form of the question …

[Defense Counsel]:  It was the form of the question.

N.T., 8/28/13, at 116-24.

Jenkins contends that the Commonwealth's questioning irreparably tainted the jury and implied that the trial court was hiding evidence from the jury.  Jenkins' Brief at 28.  While we are troubled by the prosecutor's disrespect for the trial court and his refusal to accept the trial court's ruling, we conclude that the trial court did not abuse its discretion in denying Jenkins' request for a mistrial.  First, defense counsel's objection prevented Pescatore from answering the prosecutor's questions.  Second, the trial court sustained each of defense counsel's objections, and provided several curative instructions to the jury informing them if the proper purpose of Pescatore's testimony.  This Court has long held that "[a] jury is presumed to follow a trial court's instructions[.]"  ***Commonwealth v. Reid***, 99 A.3d 470, 501 (Pa. 2014).  Additionally, at the outset of Pescatore's testimony, the trial court instructed the jury as follows:

> THE COURT:  I'm just going to let my jury know that the district attorney is about to present to you what we call a statement from one of the witnesses that you heard from, Mr. Jackson.  I want to give you some special instructions about this statement or whatever it is you are about to hear.
>
> What you're about to hear is not, is not, substantive evidence.  When we say "substantive evidence," it means that it's not -- the only reason that you're going to be hearing preliminary hearing -- some things that may have been said at a preliminary

hearing is for you to assess whether certain statements made here in court were consistent or not here in court. This is to help you to assess somebody's credibility. It is not in any way being admitted into evidence. The rules -- and I'll read for you what the Rule of Evidence is so that you'll understand that there – the evidence rules say that under certain circumstance[s] -- and we've had a hearing to make sure that those circumstances are correct. Under certain circumstances, evidence of a witness' prior consistent statement may be heard by the jury to rehabilitate the witness. Meaning, so that you may hear this for you to make a determination whether Mr. Jackson's testimony was consistent or not, and how does that affect Mr. Jackson's testimony here in court. That's the only reason that it's being admitted. We call it rehabilitation evidence.

N.T., 8/28/13, at 112-13. Our Supreme Court has held that "[a] mistrial is not necessary where cautionary instructions are adequate to overcome prejudice." **Commonwealth v. Chamberlain**, 30 A.3d 381, 422 (Pa. 2011). Therefore, there was no abuse of discretion in the trial court's determination that the challenged questioning did not require the remedy of a mistrial.

Judgment of sentence vacated. Case remanded for a new trial. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/20/2015

- 24 -